UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | |
|---|---|
| TERRY BOOKER, | ) |
| | ) |
|    Plaintiff, | ) |
| | ) |
| v. | )   No. 2:13-CV-341 |
| | ) |
| DELFASCO, LLC and | ) |
| DELFASCO FINANCE, LLC, | ) |
| | ) |
|    Defendants. | ) |

## **MEMORANDUM OPINION**

Before the Court is the Defendant's Amended Motion for Summary Judgment [doc. 17]. Plaintiff has filed a response [docs. 28]. Oral argument is unnecessary, and the motion is ripe for the Court's determination.

Plaintiff brought suit pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, for alleged discrimination related to the termination of his employment. For the reasons that follow, Defendant's motion will be DENIED.

### *I.   BACKGROUND*

Defendant-employers are Delfasco, LLC and Delfasco Finance, LLC, (collectively "Defendant" or "Delfasco"). Delfasco operates a manufacturing facility in Greene County, Tennessee, where it manufactures munitions. Delfasco employed the Plaintiff, Terry Booker (hereafter "Plaintiff" or "Mr. Booker"), from 1990 until he was discharged on March 1, 2012. Mr. Booker claims that Delfasco discharged him after his wife was diagnosed with cancer, in violation of the ADA and the FMLA. Mr. Booker alleges that the primary impetus behind his termination was the cost of insuring his wife on the

1

company's health plan. Delfasco maintains that its decision to terminate Mr. Booker was unrelated to his wife's illness and was due to his poor work performance.

In 2011, Mr. Booker's wife was diagnosed with multiple myeloma, a life-threatening cancer, and began undergoing medical treatment. Records indicate that gross costs for her treatment exceeded $150,000. Some of Mrs. Booker's medical bills were paid by the Plaintiff's family health insurance plan, which was available to him as a benefit of his employment with Delfasco. The health insurance plan provided by Delfasco was a partially-self funded plan, wherein Delfasco was responsible for its employee's medical claims, and would be reimbursed by a third-party insurer after an individual's expenses exceeded a set amount. Delfasco's Human Resources Manager, Steve Powell, recalled this amount was around $75,000 or $80,000 in 2011.

Mrs. Booker's condition and treatment were known to Delfasco early on. Mr. Booker testified that Mr. Powell had brought up the issue of his wife's medical expenses in a conversation during the fall of 2011. In that conversation, Mr. Powell told Mr. Booker that expensive medical treatments could cause insurance rates to increase dramatically and that they would have to "sit down and have a talk" about her healthcare and insurance. Mr. Booker stated that Mr. Powell instructed him not to discuss the conversation with anyone else. The Plaintiff also testified to another conversation in the summer of 2011, wherein Mr. Powell had urged him not to seek treatment for his wife and that money spent on medications to treat advanced cancer was wasted.

Shortly after his wife's diagnosis, Mr. Booker applied for and was granted intermittent leave under the FMLA. He used some of his leave intermittently between June and December 2011, but also took off approximately twenty consecutive days to accompany

2

her to Nashville for treatment in December 2011. Thereafter, Mr. Booker returned to work at Delfasco, where he was reinstated in his previous position with no change in pay. Mr. Booker continued work, apparently without further leave, until March 1, 2012. On March 1, Steve Powell and Randy Shipley, Delfasco's Plant Manager, informed Mr. Booker that he was being discharged for poor performance.

Delfasco's decision to terminate Mr. Booker coincided with negotiations over renewal of its health insurance plan[1]. Mr. Powell testified that Delfasco's owner, Jack Goldenberg ("Mr. Goldenberg"), was aware of Mrs. Booker's healthcare expense and that it was a source of concern to him in the weeks before these negotiations. The Plaintiff also submits additional supporting evidence. To wit:

- On May 24, 2011, Mr. Powell copied Mr. Goldenberg on an email noting Mrs. Booker's diagnosis and advising him to "flag $75,000 of [Delfasco's] funding account in anticipation of the employee exceeding the specific."

- In late 2011 or early 2012, Mr. Powell informed Mr. Goldberg that health insurance premiums would increase under the renewal because of the unknown cost of Mrs. Booker's continued medical treatment.

- Mr. Goldenberg indicated to Mr. Powell that he "wanted to find a way to not have Mr. Booker impact [Delfasco's insurance] rates."

- Mr. Booker was the only employee with a large claim against the health insurance plan in 2011.

- Emails Mr. Powell sent in January 2012 indicate that Delfasco had become delinquent on some of its medical expense accounts.

---

[1] This is, apparently, a disputed fact. Although Mr. Goldenberg swore in an affidavit that there were no such negotiations, Mr. Powell's deposition testimony is clear on this point.

- In an email dated February 10, 2012, the insurance underwriter requested that Mr. Powell provide information on Mrs. Booker's prognosis. The underwriter later instructed Mr. Powell to disregard the request because Mr. Goldenberg, who was copied on the email, had responded first. The substance of Mr. Goldenberg's response was unknown to Mr. Powell.
- Mr. Powell also testified that Mr. Goldenberg was unhappy with the first renewal quotes that he (Mr. Powell) received and wanted to negotiate for lower rates.
- On or about March 1, 2015, Steve Powell informed the employees that their health insurance plan had lapsed on February 29 and that Mr. Goldenberg would be re-negotiating for a renewal.

Mr. Booker was discharged on the same day the employee benefits meeting was held. Mr. Powell testified that the decision to discharge Mr. Booker came from Mr. Goldberg, that he had not been consulted, and that he did not agree with the decision. Further, his recommendation to review Mr. Booker's performance evaluations and follow the relevant disciplinary procedures was not followed. Sometime shortly after Mr. Booker was terminated, Delfasco renewed its insurance plan.

A "Separation of Employment" form, signed by Mr. Booker and the Defendant listed "Performance" as the reason for discharge, but no other details were given. Mr. Booker applied for unemployment benefits with the Tennessee Department of Labor ("DOL"). The statement issued by the DOL states that Mr. Booker was discharged for "unsatisfactory job performance," but notes that Mr. Booker reported that "he was doing the job to the best of his ability." Delfasco apparently did not respond to the unemployment claim or contribute to its contents.

4

The Defendant argues that Mr. Booker's performance was substandard and that it had addressed the issue with him in the past. As proof, it points to negative marks on an annual performance evaluation generated in August 2010 and Mr. Booker's testimony that a supervisor had instructed him to "stay busy" during down times on one occasion. The evaluation cited his poor written communications, failure to meet commitments, failure to contribute to profits, failure to develop project plans satisfactorily, and failure to ensure that his job responsibilities were covered when he was absent. However, there are also positive marks on the evaluation. Mr. Booker's performance review for 2011 evidences improvement in the areas noted and contains no negative marks. Mr. Booker claims that he was not aware of any dissatisfaction with his performance and notes that he received recognition for a cost-saving idea that was implemented on the line in December 2011.

In a report to the EEOC, Delfasco represented that it reduced its workforce by more than half between December 2011 and September 2012, "discharg[ing] its poor performers" in effort to address a deflated economy. However, Mr. Powell testified that "around the time of the renewal process Mr. Booker was the only involuntary separation [Delfasco] had."

## II. STANDARD OF REVIEW

Rule 56(a) sets forth the standard for governing summary judgment and provides in pertinent part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(c) requires that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion[.]" This can be done by citation to materials in the record, which include depositions, documents, and affidavits, or by showing that a party cannot support a

5

proffered fact. Fed. R. Civ. P. 56(c)(1). In short, the moving party must show that the non-movant lacks evidence to prove the essential elements of its claim. *Celotex v. Catrett*, 477 U.S. 317, 322-23 (1986). A non-moving party defeats summary judgment by providing probative evidence to support its claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). The court views the evidence in the light most favorable to the non-moving party, and all justifiable inferences drawn are in that party's favor. See *id.* at 255.

### III. LAW AND ANALYSIS

*A. The Nature of Plaintiff's FMLA Claim*

Under the FMLA, employees are allowed up to "12 work weeks of leave during any 12-month period" for reasons including "to care for [a] spouse . . . if such spouse . . . has a serious health condition." 29 U.S.C. § 2612(a)(1)(C). The FMLA makes it unlawful for an employer to 'discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the Act]'" *Id*. at § 2615(a)(2).

Plaintiff's brief opposing this Motion notes that there has been some ambiguity regarding his claims under the FMLA. To clarify the nature of FMLA claims, there are two distinct theories of recovery: interference and retaliation. Although the claims are closely related, the nature and elements of requisite proof differ. *Seeger v. Cincinnati Bell Tele. Co., LLC*, 681 F.3d 274, 281 (6th Cir. 2012). An FMLA interference claim alleges a denial of rights, while a retaliation claim focuses on an action taken against an employee for the exercise of those rights. *Brown v. Regis Corp.*, 498 F.3d 561, 569 (6th Cir. 2007). Review of the pleadings in this case, combined with the Plaintiff's affirmative representation of intent in his brief [doc. 28], shows that the Plaintiff has not pleaded interference under the FMLA. The Court finds that, without

6

further amendments to the pleadings, the only FMLA claim addressed in this case sounds in retaliation.

### B. The Plaintiff's Claim of Retaliatory Discharge in Violation of the FMLA

In order to establish a retaliation claim under the FMLA, a plaintiff must demonstrate by a preponderance of the evidence that

> (1) he was engaged in an activity protected by the FMLA; (2) the employer knew that he was exercising his rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to him; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.

*Tillman*, 545 F. App'x at 348 (citing *Seeger*, 681 F.3d at 283; *Donald*, 667 F.3d at 761). "The central issue raised by the retaliation theory . . . is 'whether the employer took the adverse action because of a prohibited reason or for a legitimate nondiscriminatory reason.'" *Seeger*, 681 F.3d at 282 (quoting *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006)).

The Defendant asserts that the Plaintiff cannot meet its burden of proving a prima facie case, because the decision to terminate Mr. Booker's employment was not related to exercise of his FMLA rights. In support of its claim, Plaintiff argues that the occurrence of his firing less than four months after taking leave in December of 2011 is sufficient evidence to make a prima facie showing of causal connection between the two events. Indeed, the Sixth Circuit has determined that temporal proximity is sufficient evidence to establish a prima facie case of retaliatory discharge under the FMLA. *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (2001); *Brown*, 498 F.3d at 571 (describing plaintiffs' burden on showing a prima facie case of FMLA discrimination as a "low threshold"). In light of the facts that Mr. Booker took several weeks' of leave in the months preceding his termination, with the most recent less than three

7

months prior, and the known possibility that he would continue to seek protected leave, the Court is persuaded that a jury could reach a reasonable conclusion that Mr. Booker's exercise of his FMLA rights was a factor in the Defendant's decision to terminate his employment.

Because Mr. Booker has submitted only circumstantial evidence that Delfasco was motivated to discharge him due to his FMLA leave, the court must apply the familiar *McDonnell Douglas* burden-shifting standard. *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F3d 367, 381 (6th Cir. 2002). Once the plaintiff has established a prima facie case of discrimination, the burden shifts to the defendant, who must proffer a legitimate, non-discriminatory reason for the adverse employment action. *Brown*, 498 F.3d at 570. The burden then shifts back to the plaintiff to show that the proffered reason was merely pretext for unlawful discrimination. *Id.* A plaintiff may demonstrate pretext by showing that the employer's proffered reason "(1) had no basis in fact; (2) did not actually motivate the action; or (3) was insufficient to warrant the action." *Seeger*, 681 F.3d at 285 (citing *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)). However, "[a]lthough the burdens of production shift, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Brown*, 498 F.3d at 570 (citing *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 363 (6th Cir. 2007) (internal quotation marks omitted)).

Having determined that the Plaintiff has shown a prima facie case supported by evidence, the Court now turns to Delfasco's burden to present evidence of "reasons for its actions which, if believed by the trier of fact, would support a finding that [discrimination] was not the cause of the employment action." *St. Mary's Honor Ctr. V. Hicks*, 509 U.S. 502 (1993). The Defendant claims that it terminated Mr. Booker not because of his FMLA requests, but because of his poor

8

performance. In support of the legitimacy of its decision, Defendant points to (1) a performance review noting dissatisfaction with Mr. Booker's work in August of 2010, before his wife was diagnosed with cancer, (2) Mr. Booker's own testimony that he was told his termination was due to poor performance, (3) the fact that Mr. Booker signed his Termination Notice and (4) Mr. Booker's subsequent citation of poor performance as the reason for his termination on an unemployment application. Of the four, three do not support the Defendant's claim that it did not discriminate against the Plaintiff. The latter two, concerning Mr. Booker's conduct after his termination, have no relevance to the issue of Delfasco's motive in terminating him. Likewise, the second factor does little to advance the Defendant's argument; there is no dispute over the Defendant's *stated* motive, but rather, its *actual* motive. Furthermore, the Court does not equate acknowledgment of Delfasco's claimed reason for his termination with an agreement to its validity. Mr. Booker has presented evidence that he made his opposition to Delfasco's decision known to it. As to the performance review that Mr. Booker received in 2010, unsatisfactory work can be a legitimate, non-discriminatory reason to terminate an employee. While Delfasco has not presented additional supporting evidence, the Court is not aware of any law requiring employers to document every instance of dissatisfaction with an employee's performance. Delfasco has therefore met its burden of proffering a non-discriminatory reason for his discharge.

In turn, however, the Plaintiff has presented evidence to question the truth of Delfasco's claims that he was underperforming. He notes that a more recent review showed he had corrected the prior work deficiencies and did not contain any negative comments. He also testified that he had not been made aware of dissatisfaction with his work performance, that his supervisors had been happy with him, and that he was awarded for his innovation only months before his discharge. The Defendant presents no testimony or documentation to rebut this evidence. Mr.

9

Booker's testimony that a supervisor had asked him to "stay busy" once is not grounded in any time frame and there is no testimony that would clarify this incident. Moreover, there is no explanation of why the Defendant chose to take adverse action against Mr. Booker in March of 2012, after he exercised his FMLA leave, rather than in August of 2010, when the negative review was issued. Where an employer changes his treatment of an employee and takes disciplinary action only after he engages in protected activity, there is evidence to support an inference of pretext. *Lamer v. Metaldyne Co. LLC*, 240 Fed. App'x 22, 32 (6th Cir. 2007) (citing *Cantrell v. Nissan N. Am., Inc.*, 145 Fed. App'x. 99, 105-07 (6th Cir. 2005)).

Plaintiff has submitted sufficient evidence to create a genuine issue of fact as to whether the Defendant's claimed dissatisfaction with Mr. Booker's performance had any basis in fact, and if so, whether it rose to the level warranting termination and actually motivated the decision to terminate his employment. Although the Plaintiff will have the "ultimate burden" of proving to the jury that Defendant discriminated against him because of his FMLA requests, he has satisfied the requirements of showing pretext under the *McDonnell Douglas* test and has presented facts that, if true, could lead a reasonable jury to infer that his discharge was in violation of the FMLA.

### C. *The Plaintiff's Claims Under the ADA*

Plaintiff has also asserted that his termination was unlawful under the ADA. The ADA prohibits employers from discharging a qualified employee on the basis of a disability. 42 U.S.C. § 12112(a). Discrimination under the ADA includes discharge not only because of an employee's own disability, but also because the employee was associated with a disabled individual. 42 U.S.C. § 12112(b)(4). Familial relationships are recognized as "associations"

10

Case 2:13-cv-00341-RLJ-MCLC Document 32 Filed 03/06/15 Page 10 of 14 PageID #: 469

protected under the ADA. 29 C.F.R. § 1630.8. To establish a prima facie case of association discrimination under the ADA, Plaintiff must show that (1) he was qualified for his position, (2) he was subjected to adverse employment action, (3) he was known to have a disabled relative, and (4) a reasonable inference can be made that his relative's disability was a factor in the decision to terminate him. *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 487 (6th Cir. 2006) (adopting test articulated in *Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1082 (10th Cir.1997)).

There does not appear to be any dispute as to the first three elements. As to the causation element, the Sixth Circuit have recognized that an employee can make a claim for association discrimination based on "expense" where he was terminated "because of his or her association with a disabled individual covered under the employer's health plan, which is costly to the employer." *Id.* (citing *Larimer v. International Business Machines Corp.*, 370 F.3d 698, 700 (7th Cir. 2004)). While there are few Sixth Circuit cases dealing with expense discrimination, the *White v. Carmeuse Lime & Stone* case is factually analogous to the present circumstances and is illustrative of the theory. No. 2:09-cv-265, 2011 WL 3585064 (W.D. Mich. May 31, 2011). There, an employee alleged that his termination was due to the excessive cost of insuring his daughter while she was being treated for leukemia. In determining that the Plaintiff could not establish causation under *Larimer*, the court found there was no evidence the employer's management was aware of the child's healthcare costs, those costs had never been discussed with the plaintiff, and there was no suggestion that the employer had attempted to reduce its health benefits cost. *Id.* at *8-9. The Seventh Circuit Court of Appeals, however, reversed a summary judgment order on an expense discrimination claim where there was evidence that the self-insured employer was experiencing financial difficulties, showed "obvious" concern for cutting

costs, tracked the specific employees who incurred more than $25,000 in medical bills, and had pulled the plaintiff aside to discuss the cost of treatment for her husband's prostate cancer. *Dewitt v. Proctor Hosp.*, 517 F.3d 944, 948 (7th Cir. 2008).

The Court is convinced that the facts presented here are more similar to the latter case. Viewing the facts in the light most favorable to the Plaintiff, he has shown, through deposition testimony and documentary evidence, that Delfasco was aware that the expense of treating his wife's cancer had been high in 2011 and that continued treatment would raise the cost of providing health benefits to its employees. Mr. Powell spoke with Mr. Booker regarding the implications of her medical expenses and indicated that they would be a concern in early 2012, when Delfasco's insurance plan was set to expire. Delfasco's own representations to the EEOC note that the company was negatively impacted by the economic climate. Around the time of Mr. Booker's discharge, Delfasco was engaged in a renewal of its health insurance plan and could easily deduce that terminating Mr. Booker's employment would result in more favorable rates. Mr. Booker was the only employee with a large insurance claim in 2011 and the only employee who was discharged around the time of the insurance plan renewal. After Mr. Booker was terminated, the company did in fact renew its health insurance plan. Based on those facts, a reasonable jury could conclude that the cost of insuring Mrs. Booker was a motivating factor behind Delfasco's decision to terminate Mr. Booker's employment.

Whether or not this finding ends the inquiry gives rise to a dispute over evidentiary burdens and the correct application of the *McDonnell Douglas* analysis. The parties disagree on what standard should apply to the Plaintiff's associational discrimination claim. Defendant argues that the *McDonnell Douglas* burden-shifting applies because the Plaintiff has not produced direct evidence to support its claim. Plaintiff argues that it has cited direct evidence,

12

most convincingly in the form of Mr. Goldenberg's indication that he "wanted to find a way to not have Mr. Booker impact [Delfasco's] rates. Plaintiff is correct in asserting that the *McDonnell Douglas* analysis is not necessary where there is direct evidence of employment discrimination. *Brown v. Regis*, 498 F.3d 561, 570 (6th Cir. 2007). The question before the Court, therefore, is whether Plaintiff's evidence must be construed as direct evidence, entitling the Plaintiff to a jury, or circumstantial evidence invoking the tripartite burden-shifting analysis.

To begin, courts have noted that the issue of what constitutes direct evidence is one "that has baffled the courts for some time." *Wright v. Southland*, 187 F.3d 1287, 1288 (11th Cir. 1999); see also *Speen v. Crown Clothing Corp.*, 102 F.3d 625, 636 (1st Cir. 1996) (stating "the line . . . between what constitutes direct and indirect evidence of discriminatory motive is blurred rather than clearly drawn.") The Sixth Circuit has described direct evidence of as that which "requires the conclusion that unlawful [discrimination] was a motivating factor in the employer's action." *Abbott v. Crown Motor Co*., 348 F.3d 537 (6th Cir. 2007) (emphasis omitted). Relevant here, courts have also addressed the particular difficulty of applying the *McDonnell Douglas* standard in association discrimination claims. *Dewitt*, 517 F.3d at 948. Likening it to "a mean stepsister trying to push her big foot into one of Cinderella's tiny glass slippers[,]" the *Dewitt* court noted that the familiar standard is not easily adaptable to such claims. *Id.* Ultimately, the court determined that the standard was not necessary because the Plaintiff's evidence was sufficiently persuasive to be considered direct, rather than circumstantial. *Id.*

As noted, the material facts in the present case are remarkably similar to those addressed by the *Dewitt* court and, under the Seventh Circuit's view, may well be considered direct. However, the Court does not find it necessary to continue grappling with an elusive standard, nor to announce new standards for the level of circumstantial evidence that equates to direct

13

evidence, as the result here would be the same either way. Assuming that the Plaintiff has not presented direct evidence of discrimination and must meet the additional burden of showing pretext, the same facts that bore upon the Plaintiff's FMLA claim are relevant to its ADA claim and are suggestive of the Defendant's discriminatory motive. The Plaintiff has submitted documentary evidence to rebut the Defendant's claims that Mr. Booker's performance was unsatisfactory and thus challenged the basis of the Defendant's claimed non-discriminatory reason. The Court is satisfied that the Plaintiff has presented sufficient evidence to create a question of fact as to Delfasco's true motivation for discharging him.

## *IV.    CONCLUSION*

Based on the remaining issues of material fact as discussed herein, the Defendant's Amended Motion for Summary Judgment [doc. 17] is **DENIED** as to the Plaintiff's claims under the FMLA and the ADA.

**IT IS SO ORDERED.**

ENTER:

s/ Leon Jordan
United States District Judge